21-5063, 21-5147, 21-5404, United States v. Rossen Iossifov, and Demetrius Anton Brown. Arguments not to exceed 20 minutes to be shared by defendants. 20 minutes for plaintiff. Mr. West, four-palate, defendant. May it please the court, I would like to reserve two minutes for rebuttal, please. Very well. Court, please, my name is Kevin West. I represent the defendant appellate Rossen Iossifov. Mr. Iossifov is a Bulgarian citizen who had never stepped foot on American soil or communicated with anyone in the United States until he was extradited in this prosecution. We would respectfully ask the court to vacate Mr. Iossifov's conviction and instruct the district court to enter a judgment of acquittal on both the conspiracy to commit money laundering and the conspiracy to violate the RICO statute counts. Alternatively, we would ask the court to reverse and remand with instructions to conduct the trial on remand without the introduction of the testimony of Marco Leopold, the person who rephrased the 404B argument, and to limit the testimony of Andre Stosia to eliminate any reference to statements made by, with regard to Mr. Iossifov. If the court does not vacate the conviction or reverse the conviction, we would ask the court to vacate the sentence imposed and remand to the trial court for resentencing based upon an improper loss amount and an improper obstruction enhancement. With the court's permission, I will focus on the arguments related to the admission of hearsay and 404B testimony, the new trial motion, and how those arguments interface with our argument with regard to the insufficiency of the evidence to support the conviction on either of the counts. Many of the facts presented at the trial were undisputed. For instance, there was no dispute that the Romanian fraudsters engaged in a scheme where they placed false advertisements on the Internet and then took money from American victims without providing products. Mr. Iossifov did not dispute that at trial. He does not dispute it now. It was undisputed that there were American exchangers who would take the proceeds from these fraudulent transactions and convert them from U.S. currency to Bitcoin and that those would then be transported overseas. It's equally undisputed that Mr. Iossifov, my client, was never in the United States and never communicated with anyone in the United States during the course of this alleged conspiracy or at any other time. He never used an alias. Unlike all the other co-defendants in the case, he always used his correct name. He operated a legitimate business which he advertised on the Internet with regard to the exchange of Bitcoin. Although there is some debate between the United States and Mr. Iossifov with regard to the composition of his clients, there was no dispute that the overwhelming majority of his clients were legitimate customers. The United States raised issues with regard to the amount of money that the people involved in fraud were exchanging in Bitcoin, but there was no dispute that the only overwhelming majority of the folks that Mr. Iossifov was servicing were legitimate customers. The crux of the case is, and is on appeal, did Rossin exchange Bitcoin for the Romanians knowing that they were engaged in fraud? Isn't a big indication, or purported indication at least, of your client's knowledge of the illegality was due to the fact that your client had protocols to prevent illegal transactions and did not follow those? And that pretty much seems undisputed. Well, I think that there may have been no dispute that that happened, but that in and of itself, Judge Clay, was not illegal. The government focused a lot of their proof of that on trial with regard to these policies and procedures and said that Kraken and Bitcoin required those, or Bitstamp required those, but there were no, either in the United States nor in Bulgaria, were there any legal requirements with regard to any of the identification of customers and things of that nature. So we don't think that that certainly was sufficient evidence that would support a conviction under either of the fraud counts. So I want to make sure I understand the various parts of your argument. Yes, Your Honor. If we conclude that there was sufficient evidence to support a finding that your client knew that the money he was exchanging, or the Bitcoin that he was exchanging, came from fraudulent activity, that, let's say, there's enough for that, that the Romanian clients got this money fraudulently, does that end it? Well, if the Court please, we also have our jurisdictional argument. With regard to the sufficiency of the evidence argument, if there was sufficient proof that he knew that fraud was occurring, we would have to concede that that would be enough to sustain the convictions. But we think that is why it's so important to consider our evidentiary arguments, we believe, in conjunction with the sufficiency of the evidence argument. The only direct evidence, the only person that came in and testified that Rosen Yosifov had direct knowledge that there was fraud occurring was Andrei Stosha. And he did not say Mr. Yosifov told him fraud was occurring, he said that Razan Sandu, a co-conspirator who has to this day not been apprehended, came in, that he had told him that Mr. Yosifov knew that fraud was occurring. And we never had the opportunity, obviously, to cross-examine Mr. Sandu with regard to that statement. And that is why we believe that with regard to the admission of co-conspirator testimony, that the conviction should be reversed, because that was such an integral part. Right, but your argument on that is that he wasn't a co-conspirator, right? It is, Your Honor. Okay, you're not making any constitutional objections or anything like that? I do think that it has to be viewed in that light also, because his ability to cross-examine his accusers was limited by the admission of this conspiracy, the statement of an alleged co-conspirator. But you're right, from the essence of looking at the rule, and it's the portion of the rule that would allow admission of a co-conspirator statement, that there has not been any proof that he was a co-conspirator. And I understand that these arguments are all intertwined, including the 404B argument with regard to Marco Leopard, for the same reason. And because there was such a lack of direct evidence, and we concede that circumstantial evidence can be sufficient to support a conviction, but there was a lack of any direct evidence. And when all these things are taken into account, with the evidentiary rulings with regard to the admission of co-conspirator testimony that we believe was improper, and with regard to the admission of the 404B testimony of Marco Leopard, we believe that all those things together lead to a conclusion that there was not sufficient evidence. If those were excluded, there would not have been sufficient evidence to support a conviction. There was a lot of money exchanged here, was there not? I think it's $3.5 million. It's your argument that he had no reason to think that this $3.5 million might have been fraudulent money? Well, Judge Griffin, I agree that's a lot of money. That's not a normal exchange, I assume, in his business. And you're trying to say a reasonable juror could not view the circumstantial evidence and find that he's part of this conspiracy. Well, I just think the amount of money that he's exchanging bitcoins into currency, that itself I think is some evidence that there may be some illegal money being laundered here. No? Well, Judge Griffin, I think our point there is that even though there was a lot of money exchanged, there's no doubt, there was no argument that he was not involved in legitimate bitcoin exchange. And under the laws either of the United States or the Republic of Bulgaria, there was nothing illegal in and of itself with regard to the exchange of bitcoin. With regard to the amount that the court referenced, that was part of our argument with regard to the sentencing phase of the case in that the presentation that the United States made to come up with that number included legitimate transactions also. And I see my time's up. I'd like to ask about the other issue, the jurisdiction issue. Yes, Your Honor. Now, assuming that, I guess that breaks down into two. One is the statutory authorization and the other is due process, right? Yes, Your Honor. So, the statute itself appears to be very broad in its intent. What is your argument that there was no jurisdiction over your client? Well, I think that the court has really hit upon it. I mean, there's the extraterritorial portion of the argument and then there is the venue portion of the argument also. So, those are the two primary factors that we argue with. Okay, what's enough and what isn't enough? Well, we think that in this particular instance that there would not be enough. There is absolutely no evidence that was introduced at trial that Mr. Yosifov knew anything about any activities that were occurring in the United States. So, we think that there would have to be at least some shred of evidence that he knew illegal activities were occurring in the United States in order to be subject to the jurisdiction of the courts here. But if he's part of the conspiracy, I mean, that solves the issue, doesn't it? Because there's a stipulation that a portion of the conspiracy occurred in the Eastern District of Kentucky, right? Yes, Your Honor. I mean, that goes to your sufficiency of the evidence argument, I guess. It does, Your Honor. And as I said at the outset, all of these arguments are intertwined. Okay, I want to make sure I understand something. Are you conceding that if all of this evidence was admissible, then there was jurisdiction? We still think that and I realize that the United States decided and there are cases that say that there's no reasonable foreseeability requirement with regard to jurisdiction, but we believe that the tie was so tenuous and that there was such a lack of evidence that Mr. Yosifov knew that there were illegal activities occurring in the United States that it would violate due process to exercise jurisdiction over it. Okay, and where are you getting the standard that he had to have known or had reason to believe that there were activities in the U.S.? And, Your Honor, as I said, I would concede there are cases with regard to reasonable foreseeability that indicate that there is no such requirement, but we believe that in order to satisfy the requirements of due process, there would have to be some knowledge in excess of what he knew. Counsel, one more question here. When you say that what your client was doing with regard to these Bitcoin transactions was not illegal, am I to understand that what you mean by that is there was no illegality simply because much of these Bitcoin transactions are unregulated? In other words, the lack of recordkeeping regarding transfers of large sums and such would have been illegal had these transactions been regulated bank transactions. And the only reason you're able to say that there was a lack of illegality is because of the absence of regulation, for lack of a better way to put it. Is that pretty much what you're saying, what your argument amounts to? I think, Judge Clay, if I understand your question correctly, there was nothing in Sofia, Bulgaria, or the United States for that matter, which made the exchange of Bitcoin in any amount illegal. That's an unregulated activity and he was engaged in a legitimate business. It only would become illegal if he was exchanging Bitcoin that he knew was the product of fraudulent transactions. And it's our position there's not sufficient evidence of that to support a conviction. But by that token, he could engage in illegality and never get convicted. All he does is not provide records of the transaction, not give receipts, not confirm verified transfers of large sums of money, knowing that he could do that with impunity because the transaction is unregulated, whereas if these were bank transactions, he couldn't do that. And if he were a normal business person, he would take precaution. I shouldn't say normal, but if he was not engaged in illegality, he would engage in record-keeping, or more record-keeping than he did, with regard to such substantial sums of money. Don't you think? Well, if the court please, I think that the proof at trial was that he did keep records of the exchange and he actually paid taxes in Bulgaria on it. The issue was, did he know that these were ill-gotten gains? Well, wait a minute. Supposedly, the evidence showed that he wouldn't even require IDs and didn't know the identity of some of these people he was dealing with. That's not how things would occur if you're not trying to hide things. Well, if the court please, there was no regulation that required him to check IDs and verify the identities of his customers. Is that because Bulgaria doesn't have any regulations on money or because it was Bitcoin? I think it was, well, and that's a complicated question, Your Honor, because I did a lot of research with regard to financial exchanges in Bulgaria and what was required and what wasn't. But certainly with regard to Bitcoin, what we hear about today, there was no regulation that would require him to check IDs. All right, thank you very much. You'll have your rebuttal time. Good afternoon. Good afternoon, Your Honors. May it please the Court, my name is Tom Kidd. I represent the co-appellant on this matter, Demetrius Brown. I would ask the Court for three minutes of rebuttal time. All right. Your Honor, what we are also asking is for this Court to remand Mr. Brown's case back to the Eastern District of Kentucky. Why are we doing that? We think he deserves a resentencing hearing based on the improper imposition of sentencing guideline enhancements. Specifically, we would raise two issues regarding sentencing enhancements, the first of which is the imposition of the obstructing justice enhancement under 3C1.1. I think it's safe to say from looking at case law and both briefs that in some ways this is a novel imposition of the obstructing justice due to the fact pattern here in regard to the underlying facts that give rise to that obstructing justice enhancement. We think it's novel and we also do not believe that the government met their burden in regard to a preponderance of evidence in regard to that enhancement. The second issue that we have raised, and the one that I will likely direct my time to first, again is the amount of loss under the United States Sentencing Guideline 2B1.1. And again, we believe that the trial court improperly determined relevant conduct specifically in how they defined the scope of the jointly undertaken criminal activity and the reasonable foreseeability of that activity. How did they not properly define relevant conduct? I'm sorry, I was distracted because my time, since I have 10 minutes and 56 seconds left, which is more than what I started with, but let me, again, I apologize for the distraction in regard to that. I'm sorry, I'm confused about what's listed and what he said, how much time he was going to, because you slash eight minutes slash two minutes, that's a total of ten. Yes, so he should have eight minutes for his primary argument and two minutes for rebuttal. I actually requested three minutes for rebuttal, but I'm fine with whatever. Oh, the sheet says two minutes. And Judge, when they talk about the split rebuttal time, when is the second going to occur? When is what going to occur? It says eight minutes slash two minutes. You want three minutes, right? I'm fine with two minutes, Your Honor. Well, do you want two minutes or three? I'll take the three that I asked for. Three? Yes. Okay, Judge. We'll start over. Yes, sir. And we'll completely start over and with three minutes rebuttal. Yes, sir. My apologies, Your Honor. Sorry about that. It's not my attention. Thank you, Judge. Okay, you have a blank slate. We'll wait for that time to get there. Let me set it, please. Okay, so one, eight. Okay, I think I'm good. Is that right? Three. So the clock's not working. No, it's working, Judge. It's the operator. Okay, so I'm starting it there. Okay. I hope you're not a person who has stage fright because that's what happens when you have to wait, but go ahead. For the record, I still have eight minutes and 37 seconds, but let's go with it in regard to here. Again, Your Honor, may it please the Court, my name is Tom Kidd. I represent the co-appellant, Demetrius Brown, on this appeal. We have our time that we are moving forward with. Your Honor, we are here asking that the three of you remand Mr. Brown's case back to the Eastern District of Kentucky for the purpose of a new sentencing hearing. We feel that that is necessary, is required, based on the trial court's original imposition of two sentencing guideline enhancements, one being the obstruction of justice enhancement, which again I believe is a fairly novel application of that guideline to the conduct, or perhaps maybe the conduct was more novel. The second sentencing guideline enhancement has to do with the amount of loss under the RICO conspiracy, and again, our issue there has to do with the fact that the trial court improperly determined the relevant conduct under 2B1C3 in regard to that loss, specifically the scope of the jointly undertaken criminal activity and the reasonable foreseeability of that activity. If I may move to that issue, Your Honor. In regard to 1B1C3, it says, in the case of jointly undertaken criminal activity, it includes basically acts or omissions of others when it's within the scope of the jointly undertaken criminal activity, in furtherance of that criminal activity, and reasonably foreseeable to the connection with that criminal activity. In regard to being within the scope, this Court is very familiar with the Donadeo factors, I hope I'm pronouncing that correctly, in regard to what is brought in to the scope of that loss. And there are the six factors, we would argue that at least number four of those, the pooling of resources or profits, err to the side of Mr. Brown. We understand the government's argument that the CI, or the confidential witness himself, is a shared resource. I don't think that any panel of this Court has specifically stated that, in regard to that being a shared resource, but we do understand that's where they are coming from in regard to that. We also question whether or not he had knowledge of the entire scope of the scheme. But having said that, I'd like to move on more to the foreseeability factor, the reasonable foreseeability. Again here, the government had a burden of preponderance of the evidence here, and one thing that the government pointed out in their brief, is how could it not be foreseeable when you had the confidential source, stating, and again, I believe it's on page ID 7314 of document 1092, that he could make $200,000 a day. So that's put in there. So obviously here, when we're saying that $2.5 million is too high, how could it possibly not be reasonably foreseeable, if he had a confidential source saying that he's making $200,000, or he could make $200,000 per day. And what I would say is that what that statement gives, in regard to the government's argument, two other aspects of the transcript take away. Pages 36 and 37, which are messages from the confidential informant to my client, and those are six months later than the earlier one, the earlier one being July of 2016, this one being January of 2017, you have the confidential informant telling my client, only one or two guys that are consistent, and right now, and working. So he's telling my client that. The following pages, pages 37 and 38 of the sentencing hearing, page ID 7331 and 7332, February 1st, 2017, we have the confidential informant saying, I only have two teams, or even doing anything. Not very fast for me either. So what we have on one hand is the confidential informant saying, yeah, I'm making $200,000 a day, and you multiply that out, and of course you can say $100 million is foreseeable, during the length of the conspiracy, but then you have here him saying, I don't have hardly anybody working for me, doing anything. So, again, in regard to a preponderance, I think it's very reasonable. It is not reasonably foreseeable that my client would have believed that there were four or three other people doing as much as he was in regard to domestic processing work. Let me ask you this. As to the loss amount, the plea agreement seems to suggest that the loss amount was limited to four people that your client was involved with, and that would suggest foreseeability. Because these are all people that your client was acquainted with and involved in. What would you say about that? In looking at the plea agreement, in the statement of facts specifically, I do not see where there are enumerated that there were three or four other people doing the same amount of fraudulent activity as my client. And maybe I'm missing it in regard to that, but I do have that in front of me. He did know that there were other people basically doing what he was doing, what they call the domestic processors of this, the ones who changed into Bitcoin. But I don't see anything in regard to that he knew that there were how many, what they were doing. He knew the existence of others, is what I would say. I do acknowledge that in the plea agreement itself there is a joint recommendation as to the amount of loss in regard to that on page three of the plea agreement. But I don't see anything in the statement of facts particularly which would indicate that. Okay, in his agreement, he agreed that he laundered or attempted to launder about $660,000. That is correct. That is the amount that he personally was responsible for. And the relevant conduct brought in the further amount, which basically was 300% more than that, going from $600,000 to $2.5 million in regard to that. What's the clear error made by the district judge in your view? I think that's the standard of appeal. It is. You have to convince us that the district judge clearly erred in his calculation. Tell us why he clearly erred. What I would say is that he clearly erred by discounting that testimony and not even addressing it in regard to making that determination of loss. The exchanges that I cited were right in front of the district judge saying that I have one or two people that are barely working, we're not doing much right now. And I would take that when combined with the preponderance of evidence burden that the government has in regard to that. And when you have two conflicting situations like that, I believe that that is not proving by preponderance of the evidence that guideline enhancement. Thank you very much. Thank you. Good afternoon. May it please the Court, Anne O'Connell Adams for the United States. Mr. Yosifov and Mr. Brown both played critical roles in a RICO and money laundering conspiracy that defrauded Americans out of millions of dollars. Brown received money from the victims and turned it into Bitcoin that went back to the fraudsters in Romania, and Yosifov completed the scheme by turning the Bitcoin back into cash. Each kept a percentage of the proceeds as did their many co-conspirators along the way. I'd like to ask you a hypothetical because I'm not sure where to draw these lines. So you have somebody in say Bulgaria and that person has a business exchanging Bitcoin or other virtual currencies into cash. And the reality is that he knows that some of the money that's coming in is probably proceeds of fraudulent activity. Is that person, but he knows nothing about, so he's dealing with people who are either from Bulgaria or someplace very close. Is that person subject, based on that information, is that person subject to the jurisdiction of any place in the world where the money that he exchanged happened to have been generated? Despite the fact that he has no knowledge of where or how it was generated, just that it's probably not legal. Yes, if that country has a criminal statute that applies extraterritorially, which the United States does. So there's a lot in that question. Whether the prosecuting country has a statute that applies extraterritorially, which we do. There's the due process outer limitation on the extraterritorial application of a U.S. law, which we can talk about as well. And then there's just the elements of a money laundering or a RICO conspiracy, which require him to knowingly join a conspiracy. But as the jury was instructed in this case, he doesn't need to know all the details of the conspiracy. He just has to know the basic fraud scheme that he's supporting. So in terms of the extraterritoriality piece, there's the two-step inquiry from RJR Nabisco that the Supreme Court has set out. And both of them kind of collapse in this case since you have a conspiracy that's operating in the United States. So under step one, we look to see if the presumption against extraterritoriality is defeated by a clear statement. You wouldn't contend that he's part of a conspiracy to defraud people by selling non-existent goods, would you? Yes. He's part of that conspiracy? Yes, he's joined that conspiracy. And that's the conspiracy that he was convicted of. It's the conspiracy that Mr. Brown pleaded guilty to. Yes, there was a conspiracy under the elements of the RICO conspiracy. Two or more people agreed to participate in the conduct of an enterprise that would affect interstate commerce, so that would affect commerce in the United States through a pattern of racketeering activity. And then the defendant knowingly joined the agreement. I thought that it was money laundering that was the subject of that. Mr. Yosifov was convicted of both a RICO conspiracy and a money laundering conspiracy. And the same is... I thought that the basis of the RICO conspiracy was money laundering. You're saying it wasn't. It was the fraud scheme. Money laundering is one of the predicate acts, yes, of the RICO conspiracy. And the fraud scheme is what he was furthering through the money laundering conspiracy. That's the underlying crime in the money laundering conspiracy as well. Well, somehow to me it looks like there were two different conspiracies. One was the conspiracy to defraud, and then the other one was the conspiracy to launder the proceeds. Yes, and the money laundering conspiracy is to launder the proceeds of the fraud scheme. And so Mr. Yosifov, that is a conspiracy that he was convicted of in terms of the money laundering conspiracy. So the money laundering conspiracy statute, which itself he was convicted under, and then it also is a predicate for the RICO conspiracy, applies extraterritorially. If it's a non-U.S. citizen involved, then it applies if conduct occurs in part in the United States. And here, since he's charged with a conspiracy, and some of the co-conspirators are operating in Kentucky and in other places in the United States, and acts in furtherance of it are happening here, it is a valid application of the money laundering statute and the RICO conspiracy statute. So someone can have no knowledge whatsoever of the fraud and still be part of the conspiracy? No, I think he has to have knowledge of a fraud scheme. And we've proven that. I mean, he has to have knowledge that when he's laundering the money, that he is helping to further a fraud scheme or disguise the profits of a fraud scheme. And we can prove that through direct evidence or circumstantial evidence, which we did in this case. So we have direct evidence from the testimony of Stojka, who had had the conversation, this is the co-conspirator statement from Razvan Sandu. Stojka was asking for advice on where to cash out his Bitcoin. Sandu tells him, cash it out with Mr. Yosifov in Bulgaria. He charges a low rate. He won't ask you for ID. And Stojka asks him, does he know about the fraud scheme? And Sandu tells him, yes, he does. We discussed it, and he even offered to find people to post the advertisements on the Internet. And we also have a load of circumstantial evidence here that Mr. Yosifov was telling the Bitcoin exchanges, I have these anti-money laundering policies in place, and then was not following any of them. He was doing large cash transactions without verifying the source, allowing customers to send intermediaries, not checking IDs, letting people use aliases to exchange the money. But I think I want to get back to that outer limit, the due process limit, because I think that is an important piece here. And it's not an argument that Mr. Yosifov, in his briefs, is making the argument, I wasn't involved in any fraud scheme at all, I was just operating a legitimate business here in Bulgaria, so he's not really touching on this, and I didn't know that the victims were Americans. We don't have to prove that he knew the victims were Americans. On the outer limit of that extraterritorial application of the statute is a due process limitation. The district court goes into all of the circuit court case law on this in document number 574, when he's rejecting all of the jurisdictional arguments. The case that we cite in our brief, United States v. Murillo, is one of the main cases on this from the Fourth Circuit, where the court says to comply with due process, the defendant doesn't need to know that his victims are American, he just needs to know that his conduct is criminal and he could be subject to prosecution somewhere. And here, we've proven that Mr. Yosifov was knowingly committing money laundering, he was knowingly supporting a fraud scheme and part of that scheme. He was also extradited pursuant to a treaty between the United States and Bulgaria that specifically covers money laundering and specifically covers offenses committed outside of the requesting state. So on page 4 of that treaty, it says, with respect to offenses committed outside the requesting state, extradition shall be granted if the laws of the requested state, so Bulgaria, provide for the punishment of such conduct committed outside its territory in similar circumstances. We cite this treaty in these pages on page 25 of our brief. And then page 26 of the treaty specifically covers money laundering. So this is not the type of thing where somebody is hauled into U.S. court with absolutely no minimum contacts, absolutely no idea that that could happen. The due process limit on extraterritoriality is satisfied here because the victims of the scheme were Americans. And we think we've proven also through Stojka's testimony about his conversation with Sandu that Mr. Yosifov did know that the victims were Americans. He said they discussed the fraud scheme and this scheme was a scheme to uniquely defraud American victims out of money by posting advertisements on Craigslist. We've talked about sufficiency, and I guess I'll move to the Sandu co-conspirator testimony. The argument that Mr. Yosifov is making on appeal is that the statement that Sandu made to Stojka was not in furtherance of the conspiracy. And he's relying on a case called United States versus Warman where this court said that some hearsay statements from a drug dealer that he sold a lot of cocaine and worked with a partner were just idle chatter or bragging and they weren't statements made in furtherance of a conspiracy. But here we think it's clear and the district court did not clearly err in finding that the statements Stojka was relaying that Sandu had made to him were in furtherance of the conspiracy. Stojka was asking for advice on where to safely cash out his Bitcoin. Sandu said, cast it out with Yosifov at RG Coins in Bulgaria and yes, he knows about the fraud scheme. It's a safe place to cash it out. So we think that's clear that those statements came in under the co-conspirator statement, exception to the hearsay rule. In terms of the 404... Did they both have the same role in the conspiracy? Stojka and Sandu. Did they have the same roles in the conspiracy? Yes, and I think Sandu, from my understanding, is kind of a bigger fish in the scheme. And Stojka describes in his testimony he had various roles over the years. He kind of joined the scheme as a teenager. He was posting things on the internet and then his role changed as he learned better English and to the point where in 2014 he was starting to deal in Bitcoin and that's when he asked Sandu, who I think was his godfather, for advice about where to cash out the Bitcoin. With respect to the 404B evidence, the testimony is from Marko Leopard. He's a North Macedonian national. The government asked for permission to put this evidence on under Rule 404B to show that in response to an expected defense from Mr. Josipov, which proved to be the case and is still a defense that he's asserting on appeal, that he didn't know that his customers were engaged in fraud, we put on evidence from Marko Leopard, a North Macedonian national, who was engaged in a completely separate fraud scheme. The first time he met Mr. Josipov, he was referred to him by a criminal acquaintance, was given a VIP card right away, and he exchanged money driving from North Macedonia into Sofia, Bulgaria under the same terms as the Romanians. There is evidence that those acts actually occurred under the first step of 404B. There were email chains that were introduced along with his testimony to show that he wasn't simply making this up. The evidence was admissible for a proper purpose. The district court said that it was to show Mr. Josipov's knowledge that his clients were engaged in fraud, and this was not just a one-off mistake he was making about the Romanians. The district court also gave limiting instructions when he testified and at the end that the testimony could only be used for that purpose to demonstrate knowledge. In this case, we actually have a unique opportunity for the district court to have evaluated the harmlessness of this testimony even if there was some error in admitting it under Rule 404B, and that's because of this extra piece of impeachment evidence that came to light after the trial when the district court rejected the new trial motion. The court said, look, the evidence that Mr. Leopard gave, it was helpful and it showed knowledge, but it was also just a tiny point in this vast proof constellation and the fact that the defense was lacking one more piece of impeachment evidence didn't make an impact in the outcome of the trial. I can move to Mr. Brown's arguments, if that's okay. The amount of laundered funds, I want to clear up one piece of confusion. The four people, Judge Clay, that you were referring to, I think that was in Mr. Josipov's sentencing. The investigator Yancey looked at four specific fraudsters, Sandu, Ogunnu, Papasku, Kuku, and did a spreadsheet of just those four people because he had an irrefutable paper trail. I think it's correct that there weren't other fraudsters or money launderers specifically mentioned in the plea agreement. What the plea agreement says for Mr. Brown is the defendant knew the funds were the proceeds of online auction fraud and voluntarily joined the scheme, which he knew involved other U.S.-based co-conspirators also laundering funds in furtherance of the scheme. Mr. Brown himself laundered $664,460. He was held accountable under the relevant conduct guideline for all of the other people laundering money through the same confidential source, which turned out to be about four times the amount of money that he personally laundered. Mr. Brown is poking at a couple of the Donadeo factors. One is the pooling of resources. As we've explained in the brief, the district court viewed the confidential source himself as the pooled resource. Information was flowing through him. He was sharing information about what was working and not working with the other money launderers in the scheme with Mr. Brown and among the money launderers working with him. We've cited some cases from other circuits about sharing rides to a currency exchange can count as pooling of resources. It's not just the sharing of profits, which we acknowledge was not happening here. Each money launderer was taking a percentage of what he personally laundered. In terms of foreseeability, we've also cited some cases in the brief showing defendants who were held accountable for multiples of what they laundered themselves. Here, Mr. Brown participated in the scheme for two years. He knew and he admitted in the plea agreement that he knew other people were playing his same role. We only used the $2.7 million that was in the confidential sources spreadsheet for all of the people he was working with as he sat here in the Eastern District of Kentucky. We've also pointed out in our brief that Mr. Brown, this is likely a conservative estimate as Mr. Brown was working directly with the Romanian fraudsters at some times. Those transactions were not accounted for in the spreadsheet that the government used to prove the amount of laundered funds at sentencing. He was also subject to a separate investigation by the United States Postal Service based on victims complaining that they were being defrauded and sending money to Brown. On the obstruction of justice enhancement for Brown, I will just respond and say this is not a novel thing that Mr. Brown did. The District Court found three cases and we cited them in our brief on page 62 where defendants did something similar. There's the King case from the 11th Circuit where the defendant filed false liens against the judge and the prosecutor. The James case from the 7th Circuit where the defendant mailed a bill for $151 million to the judge and said that the prosecutor had to pay him a licensing fee to use his name. These defendants received obstruction of justice enhancements and it's not a particularly novel application of that guideline provision here. If the court has further questions, I'm happy to answer them or I'm happy to... I want to go back to the due process. You cited a case, Murillo. Yes. Can you give me the site for that? It's in our brief. I don't have the site with me in my notes here. It's a Fourth Circuit case, M-U-R-I-L-L-O. Oh, Murillo. I got it. It should be in our table of authorities. No, I have that. Um... What were the facts there? The defendant in Murillo was a taxi driver in Colombia, I believe, who... They had a scheme where they were... You know, when people looked rich, they would get into the cab and they would rob them. And they happened to rob and kill an American diplomat in that case. And his argument was, well, I didn't know that this person was an American. And there's a due process prevents me from being held into U.S. court under this statute. And the Fourth Circuit... There's a couple of other main cases on this. Ali from the D.C. Circuit, Al-Qassar from the Second Circuit. They're all discussed in the district court's rejection of this argument in Document 567 in the record. We don't think we have to prove that he knew the victims were American. We also think we've proved it through Stoica's testimony that he discussed the fraud scheme with... Sandu discussed the fraud scheme with Diasifov, which was narrowly targeted at Americans. And I think, you know, the fact that he knew he was committing money laundering, the extradition treaty covers these circumstances, so what he was doing was illegal and subjected him to extradition to the United States. And I'll also just point out that if the rule was that you could prevent extradition, prevent prosecution in another state, just by refusing to learn who your victims were, that that would be a problematic rule as well. The Murillo case and the others discussed in the district court's opinion have this, we think, good rule that you kind of take the victim as you find them. If you're involved in a fraud scheme that targets Americans and you either prevent learning about that or you know it, especially if you know it, which we think we've proved here, then you can be subject to prosecution in the United States. Thank you. Thank you. We'll have rebuttal. Mr. West. Thank you, Your Honor. May it please the Court. I'll try to succinctly address four of the issues raised by the United States. The first with regard, and this relates to some extent, Judge Clay, to the issue you addressed about the requirements with regard to money laundering practices and the government relied upon that, I think, in their argument as well as at trial. And once again, as I stated to the Court previously, while those were requirements of the exchange services that Mr. Yosifov dealt with, Bitstamp and Kraken, those were not legal requirements imposed by any government. So we think that that's significant. With regard to the fact that the treaty that the government mentioned during the course of their argument and that whether or not this was a crime which would have been punishable in Bulgaria, certainly fraud is punishable in Bulgaria, but as far as the type of allegations within regard to this case, there was no evidence presented in the trial court with regard to that issue. The final two issues relate to Marco Leopold. As we argued in our briefs, we believe that at the very least, the case should be reversed and remanded for a new trial based upon the admission of Mr. Leopold's testimony. We believe that there was not sufficient evidence of this wholly related fraud scheme to admit it as 404B evidence. And even more importantly, with regard to the evidence, when you do the balancing as far as prejudice and probative value in this particular instance, it was particularly prejudicial based upon the fact that there was a lack of direct evidence in the case that Mr. Yosifov knew about the fraud. For those same reasons, I think that with regard to our motion for a new trial, after it was learned subsequent to the trial that Mr. Leopold was engaged in mundane laundering activities during the course of his cooperation with the United States, that that is significant impeachment and based upon the lack of other evidence in the case with application of the Barlow factors. It was certainly new. It was certainly something that was material because Mr. Leopold's testimony was a crucial piece of the evidence presented by the government and we believe that we demonstrated that it would result in an acquittal if we were entitled to impeach him based upon his illegal activity during the course of his cooperation. So for the reasons stated at the outset of the argument as well as those stated in our brief, we would respectfully request that the court grant the relief that we've requested. Thank you. Thank you. Thank you. Thank you, Your Honors, for the opportunity to argue here today. Just briefly in regard to the obstructing justice argument, I do think this court has an interesting debate going on amongst the various panels as to what the standard of review is here. I think there have been some that have said, again, that it's straight de novo, others that it's clear air, others that it's some variation. So in regard to that, in regard to the obstruction of justice, I would say that the conduct engaged in or found to have engaged in by the trial court of Mr. Brown, in looking at the two notes, doesn't cleanly fit in either application note. His conduct had nothing to do with evidence, destruction of evidence, had nothing to do with interrupting the investigation. It, of course, did not delay the proceedings. We understand that attempt is there as well in the guidelines, but he did indeed enter a plea a week later. Again, with the preponderance of evidence standard in regard to that, I would say that de novo review would be proper in this situation because we are talking about looking at justice, and this panel right here is in as good of a situation, a good of a place as the trial court in regard to determining what obstructs justice. Finally, Your Honor, as to the... Well, since you're expressing concern about the standard of review, what standard of review are you asserting is the correct one for us to use here? For the obstructing justice, I would argue that, again, that it would be the de novo standard. Again, I think there was a panel in United States v. Thomas, 933 F. 3rd 605, that at least said that they assumed for the sake of argument that this mixed question of fact and laws reviewed de novo, and they noted that our court, the Sixth Circuit, has sent mixed messages on the standard of review where a district court applies 3C1.1 to a particular set of facts, some cases reviewing de novo, others for clear air, and a few incorporating elements of both standards. Again, based on justice, I think this court doesn't have to be deferential to the trial court. You can sit here in such a way as to make that determination de novo. Okay, well, what standard of review in terms of the amount? The amount, I think the court's been pretty clear that while, of course, a panel always has the de novo review of the guidelines itself, that the underlying facts there would be based on clear air. All right. There are no further questions. Again, based on the brief and on the argument, we would ask for a remand for resentencing. Thank you again. Thank you very much, and I notice that both Mr. West and Mr. Kidd are appointed pursuant to the Criminal Justice Act, so the court certainly wants to thank both of you for accepting those appointments and doing an outstanding job on behalf of your clients. Thank you very much.